UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
SIERRA CLUB,                              )
                                          )     Civil Action No. 01-1537 (PLF)
         Plaintiff,                       )     (consolidated with
                                          )     Civil Action No. 01-1548
    v.                                    )     Civil Action No. 01-1558
                                          )     Civil Action No. 01-1569
LISA P. JACKSON, Administrator,           )     Civil Action No. 01-1578
  United States Environmental             )     Civil Action No. 01-1582
  Protection Agency,[1]                    )     Civil Action No. 01-1597)
                                          )
         Defendant.                       )
_____)


OPINION

        "This case concerns defendant EPA's failure to discharge fully its duty under the

1990 Clean Air Act amendments to promulgate regulations governing the discharge of certain

hazardous air pollutants."  Sierra Club v. Johnson, 444 F. Supp. 2d 46, 47 (D.D.C. 2006).  By

Order of March 31, 2006, this Court entered judgment for plaintiff, finding that EPA's admitted

failure to promulgate emission standards pursuant to the Clean Air Act constituted "a failure of

the Administrator to perform any act or duty under this chapter that is not discretionary with the

Administrator" within the meaning of Section 304(a)(2) of the Clean Air Act, 42 U.S.C.

§ 7604(a)(2).  See Order at 1, Mar. 31, 2006.  The Court ordered EPA to fulfill its statutory

duties regarding the promulgation of emission standards under Sections 112(c)(3) and (k)(3)(B),

Section 112(c)(6), and Section 183(e) on a prescribed schedule.  See id. at 1-3.  The Court

explained the reasoning underlying its March 31, 2006 Order in its August 2, 2006 Opinion.  See

Sierra Club v. Johnson, 444 F. Supp. at 46.

_____

        [1]        Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, EPA Administrator
Lisa P. Jackson has been substituted as the defendant for former Administrator Stephen L.
Johnson.

Pursuant to the schedule established by the Court's Order, EPA was to have fully discharged all of its statutory duties by June 15, 2009. <u>See</u> Order at 3, Mar. 31, 2006; <u>Sierra Club v. Johnson</u>, 444 F. Supp. 2d at 48. Since 2006, however, the Court has granted a number of EPA's motions to extend the deadlines in its March 31, 2006 Order, all without opposition from plaintiff. Thus, as amended, the Court's March 31, 2006 Order now requires, in relevant part, that EPA fully discharge its statutory duties under Sections 112(c)(3) and (k)(3)(B), and Section 112(c)(6) of the Clean Air Act by January 21, 2011. <u>See</u> Order at 1-2, Sept. 20, 2010; Order at 1, Jan. 12, 2011. EPA now requests an extension of this January 21, 2011 deadline — but this time its request is opposed.[2]

This matter is before the Court on EPA's motion to amend paragraphs 1(i) and 3 of the Court's March 31, 2006 Order to allow EPA additional time to promulgate regulations governing emission standards for certain hazardous air pollutants. Six intervenors have collectively filed a response in support of EPA's motion. Plaintiff opposes the motion. Upon consideration of the parties' and intervenors' arguments, the applicable legal standards, and the entire record in this case, the Court will deny in part and grant in part EPA's motion.[3]

---

[2]    The parties' papers refer to a deadline of January 16, 2011. Because that date was a Sunday and January 17, 2011 was a federal holiday, the Court, with the agreement of the parties, extended this January 16, 2011 deadline to January 21, 2011, pending a decision on EPA's motion. <u>See</u> Order at 1, Jan. 21, 2011. The Court thus refers throughout this Opinion to January 21, 2011 as the applicable deadline.

[3]    The papers reviewed in connection with the pending motion include the following: EPA's corrected motion to amend Order of March 31, 2006 ("Mot."); Exhibits 1 through 6 to Mot., including the Declaration of Panagiotis E. Tsirigotis (attached as Exhibit 6 to Mot.) ("Tsirigotis Decl."); plaintiff's opposition to EPA's motion to amend Order of March 31, 2006 ("Opp."); Exhibits A through I to Opp.; response by intervenors to EPA's motion to amend Order of March 31, 2006 ("Intervenors' Response"); the six Declarations attached to Intervenors' Response; plaintiff's reply to response by intervenors ("Pl.'s Reply to Intervenors"); EPA's reply ("Reply"); the Supplemental Declaration of Panagiotis E. Tsirigotis (attached to Reply) ("Tsirigotis Supp. Decl."); and plaintiff's surreply ("Surreply"). The Court also reviewed the parties' summary judgment papers.

## I. BACKGROUND

### A. The Clean Air Act and the 1990 Amendments

The Clean Air Act ("CAA" or "the Act") regulates hazardous air pollutants ("HAPs"). The first federal attempt to regulate these HAPs, enacted in 1970, "worked poorly." See S. Rep. No. 101-228, at 128 (1989). Indeed, from 1970 until 1990, "EPA . . . listed only eight substances as hazardous air pollutants . . . and . . . promulgated emissions standards for seven of them." See H.R. Rep. No. 101-490, pt. 1, at 322 (1990). Accordingly, on November 15, 1990, Congress enacted sweeping revisions to the Act. See Pub. L. No. 101-549, 104 Stat. 2399. The purpose of these revisions was to "entirely restructure the existing law, so that toxics might be adequately regulated by the Federal Government." S. Rep. No. 101-228, at 128 (1989). In place of the prior "risk-based approach," Congress imposed a technology-based emission-control scheme that limited EPA's discretion and that set strict requirements and deadlines for the promulgation of emission standards. See NRDC v. EPA ("NRDC II"), 489 F.3d 1364, 1368 (D.C. Cir. 2007).

> As the Court previously described:
>
> Title III of the revised statute created a complex scheme for the regulation of 189 specified [HAPs], and directed EPA to identify the sources of those pollutants and to promulgate regulations governing the emission of HAPs from those sources. Congress by statute added to the Clean Air Act the list of pollutants to be regulated, minimum stringency requirements, and *(most important for this case) regulation deadlines*. It did so because it believed that EPA had failed to regulate enough HAPs under previous air toxics provisions.

Sierra Club v. Johnson, 444 F. Supp. 2d at 48 (emphasis added).  Title III recognizes and directs EPA to identify and regulate two basic kinds of sources of air pollutants: (1) major sources; and (2) area sources.  Id.  These two types of sources are distinguished by the amount of their respective HAP emissions.  See id.; see also 42 U.S.C. §§ 7412(a)(1), (2).  At issue in this case are the following two requirements regarding both area sources and major sources:

*1. Regulate area sources of the thirty most dangerous HAPs:*  Sections 112(c)(3) and (k)(3)(B) of the Act, 42 U.S.C. §§ 7412(c)(3) and (k)(3)(B), require EPA (1) to "identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas"; (2) to identify the categories or subcategories of sources "accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants" by November 15, 1995; and (3) to issue emission standards for those area source categories by November 15, 2000.  Sierra Club v. Johnson, 444 F. Supp. 2d at 49.  The emission standards must be based on one of three types of pollution control mechanisms: (1) maximum achievable control technologies ("MACTs"); (2) health-based standards; or (3) generally available control technologies. See 42 U.S.C.§§ 7412(d)(2), (d)(4), and (d)(5).  As of 2006, EPA had fulfilled the first two of its duties under Sections 112(c)(3) and (k)(3)(B).  EPA had failed, however, to fulfill its third duty: by 2006, it had promulgated emission standards for only fifteen of seventy area source categories. Sierra Club v. Johnson, 444 F. Supp. 2d at 49.

*2. Regulate sources of seven statutorily-specified HAPs:*  Section 112(c)(6) of the Act calls for EPA to regulate the sources of seven specific HAPs, without regard to whether those sources are major sources or area sources and without regard to their inclusion on EPA's

list of sources of the thirty most dangerous HAPs.  See 42 U.S.C. § 7412(c)(6); Sierra Club v. Johnson, 444 F. Supp. 2d at 49.  EPA's duties and deadlines with respect to Section 112(c)(6) are identical to its duties with respect to the thirty most dangerous HAPs under Sections 112(c)(3) and (k)(3)(B).  See 42 U.S.C. § 7412(c)(6).  The only difference is that EPA emission standards promulgated pursuant to Section 112(c)(6) cannot be based on generally available control technologies.  Rather, the emission standards must be either (1) MACTs or (2) health-based standards.  See 42 U.S.C. §§ 7412(d)(2) and (d)(4).

As the Court explained in Sierra Club v. Johnson, because one source may emit numerous pollutants, there is the potential for EPA to satisfy its Section 112(c)(3) and (k)(3)(B) requirements and its Section 112(c)(6) requirements simultaneously.  See Sierra Club v. Johnson, 444 F. Supp. 2d at 48 n.3.  In other words, EPA may not need to promulgate regulations directly under Section 112(c)(6), because regulations it promulgates under other sections of the Act may suffice to "account[] for 90 per centum or more of the aggregate emissions" of the pollutants listed in that section.  Id. at 59.  Nevertheless, as of 2006, EPA had failed to promulgate emission standards under Section 112(c)(6) for five source categories.  Id. at 49.  These five source categories were also among the fifty source categories that were required to be regulated under Sections 112(c)(3) and (k)(3)(B).  Id. at 50.

## B. History of This Litigation

In 2001, plaintiff filed seven different complaints against EPA, each seeking relief for EPA's failure to discharge a different aspect of its regulatory duties under the Act.  These cases were consolidated, and the parties entered into a partial consent decree on May 22, 2003.

Other issues could not be resolved, however, and the parties eventually filed cross-motions for summary judgment. EPA did not contest the issue of liability: it admitted that it had failed to promulgate regulations by the statutory deadline of November 15, 2000. Accordingly, the only matter before the Court was to fashion an appropriate equitable remedy.

On March 31, 2006, the Court issued its Order denying EPA's motion for summary judgment and granting summary judgment in favor of plaintiff. The Court ordered EPA to fulfill its statutory duties under Sections 112(c)(3) and (k)(3)(B), Section 112(c)(6), and Section 183(e) on a prescribed schedule that would "best preserve the intent of Congress in enacting the 1990 Clean Air Act Amendments, without calling upon defendants to do the impossible." See Sierra Club v. Johnson, 444 F. Supp. 2d at 61. That Order required, in relevant part, that EPA "promulgate standards under CAA Section 112(d) for those area source categories listed by EPA pursuant to CAA Section 112(c)(3) and (k)(3)(B) as source categories that are necessary to meet the 90 percent statutory threshold identified in Section 112(c)(3) and (k)(3)(B), and for which it has not yet issued standards" on a set schedule to be completed in full by June 15, 2009. See Order at 2, Mar. 31, 2006; Sierra Club v. Johnson, 444 F. Supp. 2d at 48, 61. That Order further required that "[n]o later than December 15, 2007, EPA shall promulgate emission standards assuring that source categories accounting for not less than ninety percent of the aggregate emissions of each of the hazardous air pollutants enumerated in Section 112(c)(6) are subject to emission standards under Section 112(d)(2) or (d)(4)." Order at 3, Mar. 31, 2006; Sierra Club v. Johnson, 444 F. Supp. 2d at 48, 61.

After March 31, 2006, EPA moved for a number of unopposed extensions of time to complete its obligations. See Order at 1-2, Nov. 13, 2008; Order at 1-2, June 30, 2009; Order

6

at 1-2, Sept. 10, 2009; Order at 1, Apr. 13, 2010.  On August 31, 2010, EPA requested, without

opposition from plaintiff, that the Court amend paragraphs 1(i) and 3 so as to extend its deadline

from December 16, 2010 to January 16, 2011.  See Unopposed Mot. to Amend Order at 1, Aug.

31, 2010.  On September 20, 2010, the Court granted EPA's request, and the Court has since

extended the deadline to January 21, 2011.  See supra n.2.  Accordingly, as amended, the March

31, 2006 Order provides, in relevant part:

> 1. EPA shall promulgate emission standards under section 112(d) assuring that area sources representing ninety percent of the area source emissions of the 30 urban hazardous air pollutants identified pursuant to section 112(k)(3) are subject to emissions standards as follows:
>
> > \* \* \* \*
>
> > (i) EPA shall promulgate emission standards under section 112(d) or section 129 assuring that area sources representing ninety percent of the area source emissions of the 30 urban hazardous air pollutants are subject to emissions standards by January 21, 2011.
>
> > \* \* \* \*
>
> 3. No later than December 16, 2010, the Agency shall promulgate emission standards for one additional category pursuant to section 112(c)(6).  No later than January 21, 2011, the Agency shall promulgate emission standards assuring that sources accounting for not less than ninety percent of the aggregate emissions of each of the hazardous air pollutants enumerated in Section 112(c)(6) are subject to emission standards under Section 112(d)(2) or (d)(4).

See Order at 1-2, Sept. 20, 2010; Order at 1, Jan. 12, 2011.  As required by paragraph 3, on

December 16, 2010, EPA signed the final rule "National Emission Standards for Hazardous Air

Pollutants: Gold Mine Ore Processing and Production Area Source Category; and Addition to

Source Category List for Standards." <u>See</u> Def.'s Notice of Subsequent Event, Dec. 21, 2010.

Still at issue, however, is the January 21, 2011 deadline in both paragraph 1(i) and paragraph 3.

EPA now requests that this deadline be extended. <u>See</u> Mot. at 1-4.

### C. EPA's Proposed Schedule

As EPA explains, the key for each of its remaining obligations "is reaching the

ninety percent threshold." Mot. at 2. Since 2006, EPA has promulgated final rules establishing

emission standards for forty-eight area source categories pursuant to paragraph 1, and EPA has

promulgated emission standards for two source categories pursuant to paragraph 3. <u>See</u>

Tsirigotis Decl. ¶¶ 9, 10. With respect to paragraph 3, in order to reach the required ninety

percent threshold, EPA asserts that it needs to complete additional emission standards for

(1) certain area source boilers, (2) major source boilers, and (3) commercial and institutional

solid waste incineration ("CISWI") units (collectively, "the Three Air Rules"). <u>Id</u>. ¶¶ 11 & n.2,

41. With respect to paragraph 1, in order to reach the required ninety percent threshold, EPA

asserts that it needs to complete additional emission standards for (1) area source boilers, and

(2) sewage sludge incineration ("SSI") units. <u>Id</u>. ¶¶ 9, 42.

*Paragraph 3:* On April 29, 2010, the EPA Administrator signed proposed

emission standards for the Three Air Rules. Tsirigotis Decl. ¶ 23. These proposed rules were

then published in the Federal Register on June 4, 2010. <u>Id</u>. ¶ 25. Although the public comment

period was originally to close on July 19, 2010, given the significant public interest in these

rules, EPA granted extensions until August 23, 2010. <u>Id</u>. ¶¶ 29, 30. EPA received over 4,800

individual comments in response to those proposed rules. <u>Id</u>. ¶¶ 32-34. EPA now asserts that

those comments "may materially affect important decisions relating to source categorizations and coverage for the final emission standards." Mot. at 2. Thus, "EPA believes that the purpose of section 112(c)(6) and the public interest will be best served if the Agency's deadline in [p]aragraph 3 is extended . . . to April 13, 2012, so that EPA can re-propose the rules for further public comment to ensure that the final rules are logical outgrowths of the proposals." Id. at 3; see Tsirigotis Decl. ¶¶ 4, 34-37. In the alternative, EPA requests an extension until June 15, 2011 to allow EPA time to fully respond to the 4,800 individual comments it received. Mot. at 4; Tsirigotis Decl. ¶¶ 5, 40.

        *Paragraph 1:* Because the standards for certain area source boilers are necessary for EPA to complete its obligations under both paragraphs 1(i) and 3, EPA requests that the deadline for it to complete all emission standards required under both paragraphs 1(i) and 3 be extended to the same date — April 13, 2012. As to the one remaining area source category relevant to paragraph 1(i), SSI units, the EPA Administrator signed a proposed rule on September 30, 2010. Tsirigotis Decl. ¶ 47. The public comment period closed on November 29, 2010. Id. EPA received over eighty individual comments in response to its SSI proposal. Id. ¶ 48. EPA does not request an extension of time to re-propose this rule; rather, EPA requests an extension until July 15, 2011, so that it can fully respond to the individual comments it received. Mot. at 4; Tsirigotis Decl. ¶¶ 6, 49.

## II.  DISCUSSION

### A.  Standard of Review

Despite the complexity of the statutory scheme at issue, the Court is again presented with a single question for review: whether EPA has met the "heavy burden" of demonstrating that it would be impossible to comply with the current January 21, 2011 deadline for the promulgation of the remaining emission standards.  See Sierra Club v. Johnson, 444 F. Supp. 2d at 53, 58.  The principles discussed in Sierra Club v. Johnson guide the Court's decision on the matter before it now.  See NRDC v. Train, 510 F.2d 692, 713 (D.C. Cir. 1974) ("Similar considerations apply after the issuance of an order when the defendant petitions for modification or the court considers the propriety of resorting to contempt to coerce compliance.").  The Court, however, elaborates on several points.

First, it is established that where, as here, "an agency has failed to meet a statutory deadline for a nondiscretionary act, the [C]ourt may exercise its equity powers 'to set enforceable deadlines both of an ultimate and an intermediate nature[.]'"  Sierra Club v. Johnson, 444 F. Supp. 2d at 52 (quoting NRDC v. Train, 510 F.2d at 705).  Although a court may appropriately decline to impose a deadline that would call on an agency to do the impossible, the "heavy burden" of proving such an impossibility rests squarely on the agency.  Id. at 52-53 (quoting Alabama Power Co. v. Costle, 636 F.2d 323, 359 (D.C. Cir. 1979)).

As a general rule,  "[f]lexibility rather than rigidity has distinguished equity jurisprudence."  NRDC v. Train, 510 F.2d at 713 (internal quotations and citation omitted).  Nevertheless, the court of appeals has cautioned that a district court must scrutinize carefully claims of impossibility, and must "separate justifications grounded in the purposes of the Act

from the footdragging efforts of a delinquent agency." Id. "When Congress expresses its intent that regulations be promulgated by a date certain" — in this case, November 15, 2000, more than ten years ago — "that intent is of utmost importance; a court considering a claim of impossibility must not 'order a remedy that would . . . completely neutralize the mandatory nature of the statutory directive.'" Sierra Club v. Johnson, 444 S. Supp. 2d at 53 (quoting Sierra Club v. Browner, 130 F. Supp. 2d 78, 95 (D.D.C. 2001)).

      To prove impossibility, "it is insufficient for the agency to demonstrate only that it has proceeded in good faith; it also must demonstrate 'utmost diligence' in its efforts to comply with the statute." See Sierra Club v. Johnson, 444 F. Supp. 2d at 53. Because a "court's injunction should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources," NRDC v. Train, 510 F.2d at 712, it is of course not the case than an agency can fail to act with "the fullest use of resources" and then claim, at the last minute, that compliance is impossible. Instead, although an agency's current position may be relevant to a court's ultimate conclusion on whether action is impossible, a court will examine all of the agency's actions and inactions following the initial injunction or other court order in determining whether an extension of a deadline is appropriate. See id. at 712-13; Sierra Club v. Johnson, 444 F. Supp. 2d at 52-53. Here, the statutory mandates and court-ordered deadline at issue relate to the promulgation of emission standards for certain HAPs by a date certain. Thus, in order for EPA to demonstrate the existence of an impossibility for purposes of its pending motion, EPA must prove to the Court that it has in good faith exercised utmost diligence in its efforts to promulgate the required emission standards pursuant to paragraphs 1(i) and 3 by the Court's deadline of January 21, 2011.

One final point requires discussion. Although EPA, like all agencies, should always strive to develop the most effective and sound regulations, "that quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly." See State v. Gorsuch, 554 F. Supp. 1060, 1065 (S.D.N.Y. 1983). In light of Congress' express directive on the deadline for the promulgation of HAP regulations, the focus must be on "substantively adequate regulations" — *not* perfect regulations. See Sierra Club v. Johnson, 444 F. Supp. 2d at 56 ("[C]ourts evaluating claims of impossibility when an agency has failed to meet a mandatory deadline generally have rejected claims that additional time is needed to ensure substantively adequate regulations."); see also NRDC v. Train, 510 F.2d at 712 (describing the necessary "formulation of adequate guidelines"); Sierra Club v. Thomas, 658 F. Supp. 165, 175 (N.D. Cal. 1987) ("[T]he Court would extend EPA's time to compensate for its footdragging if it were convinced that doing so was necessary for the promulgation of workable regulations."). So the question remains: has EPA met its "heavy burden" of demonstrating that it would be impossible to promulgate "substantively adequate regulations" pursuant to paragraphs 1(i) and 3 of the Court's March 31, 2006 Order by January 21, 2011?

Answering this question presents a complication for this Court: the Clean Air Act "'does not allow district courts to address the content of EPA's conduct'" or "'issue substantive determinations of its own'" on promulgated regulations. Sierra Club v. Johnson, 444 F. Supp. 2d at 60 (quoting Sierra Club v. Browner, 130 F. Supp. 2d at 90). "[S]uch substantive judicial review is expressly reserved for the appropriate court of appeals." Sierra Club v. Browner, 130 F. Supp. 2d at 90. Since the Court cannot "embroil [itself] in an assessment of the substance of EPA's actions or omissions," id. at 90, the Court must be cautious where, as here, EPA's motion

for an extension of time focuses, in part, on the substantive quality of its rules. The only way for this Court simultaneously to comply with 42 U.S.C. § 7607(b) and the court of appeals' guidelines in NRDC v. Train is to give deference to EPA's ultimate conclusion on the substantive merit of its rules. As discussed below, however, even granting such deference, the Court finds that EPA has not met its heavy burden of proving impossibility.

### *B. The Substantive Concern — Re-Proposing the Three Air Rules*

EPA requests an extension of time to re-propose the Three Air Rules. These rules relate to EPA's requirements under both Section 112(c)(6), and Sections 112(c)(3) and (k)(3)(B). In light of the comments received after EPA proposed these rules on April 29, 2010, EPA contends that "[a] re-proposal would result in standards that are more defensible and will yield environmental benefits earlier, because the final standards will more likely withstand substantive review." Mot. at 20-21; see Tsirigotis Decl. ¶¶ 34, 37. According to EPA: "On balance, given the broad impact these rules will have, EPA believes that the overall public interest is best served by allowing EPA to re-propose the rules so that [it] will be able to issue emission standards that are based upon a thorough consideration of all available data and reduce potential litigation risks." Mot. at 14; see Tsirigotis Decl. ¶¶ 34, 37.

In support of its motion, EPA filed a declaration from Panagiotis E. Tsirigotis, the Director of the Sector Policies and Programs Division within the Office of Air Quality Planning and Standards, Office of Air and Radiation at EPA. Mr. Tsirigotis provides background on the rulemaking process for the Three Air Rules and explains why EPA only proposed these rules on April 29, 2010, just nine months short of the court-ordered deadline at the time, December 16,

2010.  <u>See</u> Tsirigotis Decl. ¶¶ 12-24.  In short, during the spring and summer of 2007, the court

of appeals issued three decisions that "substantially impacted how [EPA] sets MACT emission

standards" under the Act.  <u>Id</u>. ¶¶ 13, 15; <u>see</u> <u>Sierra Club v. EPA</u>, 479 F.3d 875, 882-83 (D.C. Cir.

2007); <u>NRDC v. EPA ("NRDC I")</u>, 489 F.3d 1250, 1257-61 (D.C. Cir. 2007); <u>NRDC II</u>, 489

F.3d at 1374-75.  Although EPA asserts that all three decisions had an impact on EPA's MACT

methodology, EPA explains that <u>NRDC I</u> directly related to EPA's requirements for purposes of

satisfying Section 112(c)(6), because in that case the court of appeals vacated emission standards

for major source boilers and vacated a rule regarding the definition of CISWI units.  <u>See</u>

Tsirigotis Decl. ¶ 14.

      Following these three decisions, EPA "determined that it needed additional

information from data and major industrial, commercial and institutional boilers and process

heaters and CISWI units in order to set defensible MACT emission standards" under the Act.

Tsirigotis Decl. ¶ 16.  EPA prepared an information collection request, which triggered a

complicated but, EPA contends, necessary set of time-consuming processes, involving (1) Office

of Management and Budget ("OMB") approval for its information collection request, (2) public

comment on its information collection request, and (3) a two-phased information collection

process.  <u>See</u> <u>id</u>. ¶¶ 16-23.  The first phase required facilities to submit existing information, and

the second phase required certain facilities "to conduct a suite of stack tests to evaluate their

emissions of hazardous air pollutants and certain other pollutants, such as particulate matter and

carbon dioxide."  <u>Id</u>. ¶ 17.

      After this entire process was complete, on April 29, 2010, the EPA Administrator

signed the proposed Three Air Rules.  Tsirigotis Decl. ¶ 23.  These rules were published in the

Federal Register on June 4, 2010. Id. ¶ 25. Although the comment period was originally to close on July 19, 2010, given the significant public interest in these rules, EPA granted extensions until August 23, 2010. Id. ¶¶ 29, 30.

EPA explains that it received a significant number of public comments in response. Mot. at 2; Tsirigotis Decl. ¶¶ 32-34. Specifically, EPA received over 4,800 individual comments, and Mr. Tsirigotis now asserts that "[t]hese comments raise several significant issues and provide new information and data." Tsirigotis Decl. ¶ 34. Mr. Tsirigotis explains that "there were a number of significant issues raised in the comments that may result in certain changes to the proposed rules that, [EPA] believe[s], could change the direction from the proposals sufficiently to make additional notice and comment advisable." Id. ¶ 34. Thus, according to Mr. Tsirigotis: "Based on the comments and new information and data, . . . a re-proposal of the major source boilers, area source boilers and CISWI rules would significantly bolster the strength of the final rules." Id. "[T]he re-proposal approach will result in standards that are more defensible and will yield environmental benefits earlier, because the final standards will more likely withstand substantive review." Id. ¶ 37. EPA therefore provides what it contends is "an achievable, but very aggressive schedule for a re-proposal," Mot. at 3, and requests that its deadline be extended until April 13, 2012.[4]

In response, plaintiff argues that EPA fails to meet the standard for impossibility, and that the Court therefore should deny EPA's requested extension. Among other things,

---

[4]    Intervenors' response in support of EPA's motion largely mirrors EPA's briefing, except that intervenors' position goes beyond what EPA argues, contending that the Three Air Rules are "fundamentally flawed . . . . hence re-proposals are in order." Intervenors' Response at 3. The Court's focus, however, is on EPA's view of its rules — not intervenors, who are free to seek substantive review of the rules in the court of appeals. See 42 U.S.C. § 7607(b).

plaintiff contends that EPA "adopted a rulemaking approach involving extensive discretionary delay."  Opp. at 9.  According to plaintiff, EPA's decision to collect information in two separate phases was a wholly discretionary decision that caused the information collection process to go on for more than two years.  Id.  Moreover, plaintiff contends, EPA failed to ask OMB to expedite its review of EPA's information collection request pursuant to 44 U.S.C. § 3507(j)(1)(B)(iii), which is permitted when the normal review process "is reasonably likely to cause a statutory or court-ordered deadline to be missed."  Opp. at 9; see 44 U.S.C. § 3507(j)(1)(B)(iii).  Plaintiff then notes that EPA failed to provide any discussion of how it has allocated its resources for purposes of attempting to comply with the Court's Order: "Neither EPA nor Mr. Tsirigotis indicates how many employees or contractors are working on the job and whether more could be deployed."  Opp. at 11.

Finally, plaintiff asserts that EPA's central argument is one the Court clearly rejected in Sierra Club v. Johnson: that additional time will result in more defensible rules.  See Opp. at 14 (citing Sierra Club v. Johnson, 44 F. Supp. 2d at 53, 57).  Plaintiff points out that EPA has merely suggested that "it might choose to make changes to the final rule that might not be logical outgrowths from the proposal."  Id.  EPA does not, however, "claim that it needs to make such changes or will make them."  Id.  And EPA has failed to consider Section 307(d)(7)(B) of the Act, a provision that provides for administrative reconsideration of a rule without necessarily postponing the effectiveness of that rule.  Id. at 15; see 42 U.S.C. § 7607(d)(7)(B).  Thus, plaintiff contends, EPA's concerns about the merits of its rules could be addressed under Section 307(d)(7)(B), obviating any purported need for re-proposal and further delay.  See Opp. at 15.

The Court agrees with plaintiff.  First, although much of the time-consuming rulemaking process for the Three Air Rules may have been appropriate under normal circumstances, the Court concludes that EPA engaged in discretionary delay in the face of a congressional directive.  As an example, it appears to the Court that the OMB review process took between six and eight months.  See Tsirigotis Decl. ¶¶ 16-21; Surreply at 5 n.3.  EPA could have requested expedited OMB authorization for its information collection request; such expedited authorization is expressly permitted when "the use of normal clearance procedures is . . . reasonably likely to cause *a statutory or court ordered deadline* to be missed."  44 U.S.C. § 3507(j)(1)(B)(iii) (emphasis added).  EPA asserts that, in the fall of 2007, at the time it was preparing the information collection request, it "could not have reasonably anticipated how prolonged the . . . process would become."  Reply at 17-18; see Tsirigotis Suppl Decl. ¶ 14.  By statute, however, EPA's emission standards were already seven years overdue — and EPA's court-ordered deadline was soon approaching.  Given these deadlines, it should have been clear to EPA that proceeding through the normal OMB process was "reasonably likely to cause a statutory or court ordered deadline to be missed."  See 44 U.S.C. § 3507(j)(1)(B)(iii).

Defending its information collection process, EPA also contends that, "[g]iven the public interest in the rules and the number and variety of facilities that would be regulated, it was important to secure public input . . . to ensure that the necessary information would be obtained."  Reply at 18.  But like the four-phase regulatory process proposed and rejected at the summary judgment stage, EPA's determination was "indicative of 'a level of thoroughness and scientific certainty not within the contemplation of Congress at the time it mandated the regulation of hazardous air pollutants.'"  Sierra Club v. Johnson, 444 F. Supp. 2d at 56 (quoting Sierra Club v.

17

Gorsuch, 551 F. Supp. 785, 788-89 (N.D. Cal. 1982)). "Although in most circumstances the Court defers to agency expertise about appropriate rulemaking procedures, such deference is inappropriate where Congress has unambiguously expressed its intent that these regulations be promulgated by a date certain and the agency manifestly has failed to fulfill this statutory obligation." Id.

EPA's past actions aside, what is most important is that EPA has failed to establish that it would be impossible to promulgate substantively adequate rules by January 21, 2011. As stated in Sierra Club v. Johnson, "courts evaluating claims of impossibility when an agency has failed to meet a mandatory deadline [established by Congress] generally have rejected claims that additional time is needed to ensure substantively adequate regulations." Sierra Club v. Johnson, 444 F. Supp. 2d at 56 (citing Sierra Club v. Ruckelshaus, 602 F. Supp. 892, 899 (N.D. Cal. 1984); State v. Gorsuch, 554 F. Supp. at 1065). Although EPA urges the Court to "carefully consider the time needed for EPA to ensure that standards are not seriously flawed before final rules are issued," Reply at 5, EPA itself has not actually asserted that its proposed rules are flawed or inadequate. Instead, EPA has simply expressed the concern that there is a risk these rules will be challenged. Mr. Tsirigotis states: "[T]here were a number of significant issues raised in the comments that *may result* in certain changes to the proposed rules that, [EPA] believe[s], *could change* the direction from the proposals *sufficiently* to make additional notice and comment *advisable*." Tsirigotis Decl. ¶ 34 (emphasis added); see also Tsirigotis Suppl. Decl. ¶ 26 (The Office of Air and Radiation has "recommended changes" to the Administrator "that could significantly change the direction of the proposals . . . ."). These concerns, expressed

in conditional language, do not cast doubt on the conclusion that EPA will be able to promulgate substantively adequate rules by January 21, 2011.

Finally, EPA suggests that because the rules at issue "affect almost 200,000 boilers and 176 CISWI units across the United States, and are complex and inter-related," it is appropriate to avoid any risk of error. Mot. at 20. "On balance, given the broad impact these rules will have, EPA believes that the overall public interest is best served by allowing EPA to re-propose the rules so that the Agency will be able to issue emission standards that are based upon a thorough consideration of all available data and reduce potential litigation risks." Id. at 14. EPA acknowledges that Section 307(d)(7)(B) "would provide an avenue for addressing some of the complications that have developed as these rulemakings have proceeded," but contends that "[i]n these particular circumstances . . . reconsideration is not as effective as a re-proposal in addressing the problems presented." Reply at 11; see Mot. at 20 (Although Section 307(d)(7)(B) "could provide a path for remedying some of the issues that are causing EPA to conclude that re-proposal is advisable, . . . . EPA does not believe it is the appropriate path to pursue here.").

The policy arguments EPA raises have no place in a case where Congress has mandated expedition, and its statutorily-mandated deadlines have long since passed. Unfortunately for EPA, the impossibility test is not concerned with whether — as a matter of policy — re-proposal will produce more effective rules and thus is preferable to reconsideration under Section 307(d)(7)(B). "It is emphatically not within an agency's authority to set regulatory priorities that clearly conflict with those established by Congress." Sierra Club v. Johnson, 444 F. Supp. 2d at 58. While EPA's view on the importance of its rules and the preferable course of conduct may have merit, at this stage EPA's (and intervenors') "remedy lies with Congress, not

the courts." Id. at 57. "'[T]he [C]ourt's role is to enforce the legislative will when called upon to do so.'" Id. at 54 (quoting State v. Gorsuch, 554 F. Supp. at 1062-63). Because EPA has not met its heavy burden of demonstrating that it would be impossible to promulgate substantively adequate regulations pursuant to paragraphs 1(i) and 3 of the Court's March 31, 2006 Order by January 21, 2011, the Court denies EPA's request for an extension of time until April 13, 2012 so that EPA can re-propose the Three Air Rules.

### C. The Procedural Concern — Responding to "Significant" Public Comments

Under Section 307(d)(6)(B) of the Act, a promulgated rule "shall . . . be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." 42 U.S.C. § 7607(d)(6)(B). EPA thus presents to the Court an alternative request: "[S]hould the Court deny EPA time to re-propose" the emission standards for the Three Air Rules, "EPA requests that the deadline for completing its obligations under [p]aragraph 3 [and paragraph 1(i)] be extended until June 15, 2011, to allow the Agency time to fully respond to the 4,800 individual comments received in response to the proposals . . . ." Mot. at 4. EPA also requests that the Court extend the deadline for completing its obligations under paragraph 1(i) as to the SSI units rule to July 15, 2011, "so that EPA can fully respond" to the comments to that proposed rule. Id.

As noted, EPA received over 4,800 individual comments concerning the proposed Three Air Rules. EPA explains that it is "concerned that it may not be able to adequately" respond to these comments by January 16, 2011 — now January 21, 2011. Mot. at 21. Mr. Tsirigotis' declaration is more definitive: "The Agency cannot currently respond in full to all of

the significant comments submitted on the major source, area source, and CISWI proposed rules and prepare a final rule for the Administrator's signature that is consistent with those comments by January 16, 2011." Tsirigotis Decl. ¶ 40; see Tsirigotis Suppl. Decl. ¶ 25. Mr. Tsirigotis contends that an extension until June 15, 2011 will "enable the Agency to develop responses to all significant comments received and to prepare fuller and more defensible response to those comments, which would enhance the defensibility of the final standards." Tsirigotis Decl. ¶ 40.

With respect to the SSI unit rule, EPA received over eighty individual comments in response. Mot. at 22. EPA explains that the comment period closed on November 29, 2010, only forty-five days before the current deadline. Id. EPA expresses "serious concerns" whether the agency could fully respond to these comments — all of which EPA in its motion papers describes as "significant" — by January 21, 2011. See Mot. at 22. Again, Mr. Tsirigotis' declaration is more definitive, though he expresses no such claim that all eighty comments are in fact significant: "The Agency cannot . . . currently respond in full to all of the significant comments submitted on the proposed sewage sludge incinerators by January 16, 2011." Tsirigotis Decl. ¶ 48; see Tsirigotis Suppl. Decl. ¶ 32. EPA contends that an extension until July 15, 2011 would "ensure that it has fully responded to all significant comments . . . thereby improving the defensibility of the rule." Mot. at 22; see Tsirigotis Decl. ¶ 49; Tsirigotis Suppl. Decl. ¶ 34.

Plaintiff responds that Mr. Tsirigotis' declaration "provides only the unexplained and unsupported assertion that the agency needs more time to complete its response to comments." Opp. at 10. Plaintiff contends that Mr. Tsirigotis "does not say how much of the response to comments process is still unfinished and provides no reason to believe that process

cannot be completed by January 16." Id. Plaintiff also points out that neither EPA nor Mr. Tsirigotis addresses the question of resource allocation — there is no discussion of how many employees or contractors are working on the responses or whether more could be deployed. Id. at 11. Then, describing EPA's responses with respect to other rules and findings, plaintiff asserts that completing the comment process by the Court's deadline is well within EPA's capability. Id. at 11-12.[5] Finally, plaintiff asserts that EPA has provided no information as to why it would take approximately five more months to respond to an undefined number of the 4,800 individual comments on the Three Air Rules that EPA considers "significant," and six more months to respond to an undefined number of the eighty individual comments on the SSI unit rule that are "significant." Id. at 12-13. In sum, plaintiff contends that EPA has failed to demonstrate that it is impossible for EPA to comply with the January 21, 2011 deadline.

In Sierra Club v. Johnson, the Court stressed the importance of resource allocation and rejected EPA's argument that "'other mandatory obligations' preclude its compliance with plaintiff's proposed schedule." Sierra Club v. Johnson, 444 F. Supp. 2d at 57. The Court stated that "[t]he will of Congress, as expressed in the Act, is that the promulgation of standards according to . . . mandatory deadlines should take precedence over all other rule-making that

---

[5]     For example, plaintiff notes that "EPA responded to more than 400,000 comments including approximately 19,000 individual comments on its greenhouse gases tailoring rule in four and one half months between the close of its comment period on December 28, 2009 and the signature of its final rule on May 13, 2010." Opp. at 12. "Similarly, EPA responded to more than 380,000 comments including 11,000 individual comments on its greenhouse gases endangerment finding in a period of five and one half months between the close of the comment period on June 23, 2009 and promulgation on December 6, 2009." Id.

EPA has not been expressly ordered to complete by Congress, as well as (arguably) over mandatory rulemaking for which the authorizing statute does not set a date certain." Id. The same analysis necessarily must also apply to the less substantive responsibility of the agency to respond in writing to "significant comments." Although "'[a]n equity court can never exclude claims of inability to render absolute performance,'" such claims must be supported with facts and the Court "'must scrutinize such claims carefully . . . .'" Id. at 53 (quoting NRDC v. Train, 510 F.2d at 713).

Mr. Tsirigotis' first declaration claims that EPA cannot respond in full to the comments on the Three Air Rules and the SSI unit rule by January 21, 2011 without providing any information concerning (1) what EPA has been doing since it received the comments; (2) how much of the response process is still unfinished; (3) how EPA has chosen to allocate its resources so as to attempt to comply with the court-ordered deadline; or (4) which of the 4,800 comments on the Three Air Rules or the eighty comments on the SSI unit rule genuinely are "significant." See Lead Indus. Ass'n v. EPA, 647 F.2d 1130, 1167 (D.C. Cir. 1980) (noting that it "borders on the ludicrous" to suggest that all comments "rise to the level of a comment which required a response from the Administrator"). Although EPA and Mr. Tsirigotis assert that EPA has received over 4,800 individual comments in response to the Three Air Rules and over eighty comments in response to the SSI unit rule, there is no discussion whatsoever of how many of these comments EPA in fact considers "significant." With respect to the 4,800 comments to the Three Air Rules, the Court finds EPA's lack of discussion on the matter especially telling, given that EPA asserts that it has performed an "initial review of the significant comments." See Mot. at 2; see also Tsirigotis Decl. ¶ 34 ("The Agency has spent considerable time reviewing the over

4,800 individual comments received . . . .").  By now, EPA surely must know how many are "significant" if the agency has been working as diligently as it says it has been.  With respect to the eighty comments to the SSI unit rule, although EPA in its motion papers describes them all as significant, tellingly Mr. Tsirigotis, on penalty of perjury, makes no such claim.  Compare Mot. at 2 ("EPA has serious concerns . . . as to whether it can fully respond to the over 80 significant comments . . . ."), with Tsirigotis Decl. ¶ 48 ("[W]e have received over 80 individual comments . . . .  The Agency cannot, however, currently respond in full to all of the significant comments submitted . . . .").

Plaintiff pointed out some of these flaws in its opposition, and Mr. Tsirigotis then submitted a supplemental declaration in reply.  This supplemental declaration still lacks specificity on the most crucial issues.  Mr. Tsirigotis now states that, once the comment period closed, EPA "immediately began reviewing the comments and other information, including the data." Tsirigotis Supp. Decl. ¶ 21.  Mr. Tsirigotis provides more detail on the work left to be done and asserts that EPA "has been fully embroiled in the working on the final standards at issue in this matter since the close of the comment period."  Id. ¶¶ 24, 30-34.  Both EPA and Mr. Tsirigotis remain silent, however, on whether EPA is acting with "the fullest use of [its] resources."  See NRDC v. Train, 510 F.2d at 712.  And neither EPA nor Mr. Tsirigotis makes any attempt to segregate for the Court the significant comments from the insignificant.  Finally, there is no discussion as to why EPA needs until June 15, 2011 to respond to the Three Air Rules comments that are significant and until July 15, 2011 to respond to the significant SSI unit rule comments.

While there is no support for EPA's requests for extensions until June 15, 2011 and July 15, 2011, respectively, the Court has no reason to doubt Mr. Tsirigotis' unequivocal statements that EPA "cannot currently respond in full to all of the significant comments" — however many there may be — to the Three Air Rules and the SSI unit rule by January 21, 2011. See Tsirigotis Decl. ¶¶ 40, 48. The Court therefore finds that there is no reasonable possibility that EPA will be able to comply with its mandatory duty under Section 307(d)(6)(B) of the Act to respond "to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period" by January 21, 2011. 42 U.S.C. § 7607(d)(6)(B). "Rather than order the defendant to do what is likely an impossibility," Sierra Club v. Johnson, 444 F. Supp. 2d at 59, the Court therefore will extend slightly the deadline for EPA to respond to the significant comments regarding the Three Air Rules and the SSI unit rule. EPA has not justified its request for an extension until June 15 and July 15, 2011. Nor has EPA even attempted to show that a more expeditious schedule would be impossible. Indeed, EPA's own papers make clear to the Court that its requested extensions would not reflect a schedule of "utmost diligence."[6] Accordingly, the Court rejects EPA's proposed schedule and prescribes a more expeditious one. See Sierra Club v. Johnson, 444 F. Supp. 2d at 52-53. The January 21, 2011 deadlines in paragraphs 1(i) and 3 are extended to February 21, 2011.

---

[6] In fact, some of the work contemplated appears duplicative: although EPA asserts that it has already performed an "initial review of the significant comments" to the Three Air Rules, Mot. at 2, Mr. Tsirigotis indicates that EPA is apparently planning on reviewing again "all of the 4,800 comments . . . to ensure that [EPA] ha[s] fully considered all of the issues," Tsirigotis Supp. Decl. ¶ 30(a).

CONCLUSION

For the foregoing reasons, defendant EPA's motion to amend the Court's March

31, 2006 Order [Dkt. No. 136] is DENIED in part and GRANTED in part.

An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/
PAUL L. FRIEDMAN
DATE:  January 20, 2011                    United States District Judge